# EXHIBIT C

THIS INSTRUMENT AND THE SECURITIES ISSUABLE UPON THE CONVERSION HEREOF HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED. THEY MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED, HYPOTHECATED, OR OTHERWISE TRANSFERRED EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY THAT REGISTRATION IS NOT REQUIRED UNDER SUCH ACT OR UNLESS SOLD PURSUANT TO RULE 144 UNDER SUCH ACT.

UNLESS PERMITTED UNDER SECURITIES LEGISLATION, THE HOLDER OF THIS SECURITY MUST NOT TRADE THE SECURITY BEFORE THE DATE THAT IS 4 MONTHS AND A DAY AFTER THE LATER OF (I) THE DATE OF ISSUANCE, AND (II) THE DATE THE ISSUER BECAME A REPORTING ISSUER IN ANY PROVINCE OR TERRITORY.

**TACHYON ACCELERATOR PROGRAM**
**Convertible Equity Instrument**

"***Purchase Price***"                                                          "***Date of Issuance***"

$75,000.00                                                                November __, 2018

FOR VALUE RECEIVED, BlockCrushr Inc., a corporation incorporated under the laws of Canada (the "***Company***"), hereby grants ConsenSys Fund I, L.P. ("***ConsenSys***"), the right to certain shares in the capital of the Company and certain additional rights, as set forth. This Convertible Equity Instrument is one of a series of Convertible Equity Instruments to be entered into by the Company and ConsenSys, pursuant to which, ConsenSys may, in its sole discretion, invest up to $100,000.00 (the "***Maximum Purchase Price***") in the Company across multiple Convertible Equity Instruments in substantially the same form in connection with the Company's participation in the Tachyon Accelerator Program.

1.      Definitions.

(a)      "***Common Shares***" shall mean the common shares in the capital of the Company.

(b)      "***Conversion Shares***" shall mean:

(i)      with respect to a conversion pursuant to Section 2.1, the class or series of the Company's Preferred Shares issued in a Qualified Equity Financing.

(ii)      with respect to a conversion pursuant to Section 2.2, the class or series of shares in the capital of the Company being issued in a Non-Qualified Equity Financing;

(iii)      with respect to a conversion pursuant to Section 2.3, the Common Shares of the Company; and

1

(iv)    with respect to a conversion pursuant to Section 2.4, shares of a newly created series of the Company's Series Seed Preferred Shares, upon the terms and provisions set forth in the most recent version of the Series Seed documents posted at www.seriesseed.com (or if not so posted, as reasonably agreed by the Company and ConsenSys).

(c)    "*Convertible Equity Instrument*" or "*Convertible Equity Instruments*" shall mean the instruments issued by the Company to ConsenSys in the form hereof.

(d)    "*Conversion Percentage*" shall equal 5.25%.

(e)    "*Corporate Transaction*" shall mean (i) the closing of the sale, transfer, exclusive license or other disposition of all or substantially all of the Company's assets, (ii) the consummation of the merger or consolidation of the Company with or into another entity (except a merger or consolidation in which the holders of shares in the capital of the Company immediately prior to such merger or consolidation continue to hold at least 50% of the voting power of the shares in the capital of the Company or the surviving or acquiring entity), (iii) the closing of the transfer (whether by merger, consolidation or otherwise), in one transaction or a series of related transactions, to a person or group of affiliated persons (other than an underwriter of the Company's securities), of the Company's securities if, after such closing, such person or group of affiliated persons would hold 50% or more of the outstanding voting shares of the Company (or the surviving or acquiring entity), or (iv) the liquidation, dissolution or winding up of the Company; provided, however, that a transaction shall not constitute a Corporate Transaction if its sole purpose is to change the state of the Company's incorporation or to create a holding company that will be owned in substantially the same proportions by the persons who held the Company's securities immediately prior to such transaction.  Notwithstanding the prior sentence, the sale of Preferred Shares in a bona fide financing transaction shall not be deemed a "Corporate Transaction."

(f)    "*Equity Securities*" shall mean the Company's Common Shares or Preferred Shares or any securities conferring the right to purchase the Company's Common Shares or Preferred Shares or securities convertible into, or exchangeable for (with or without additional consideration), the Company's Common Shares or Preferred Shares, except any security granted, issued and/or sold by the Company to any director, officer, employee or consultant of the Company in such capacity for the primary purpose of soliciting or retaining their services.

(g)    "*Financial Statements*" shall mean an income statement, balance sheet, statement of shareholders' equity, and/or a statement of cash flows, in each case as of the end of (i) each of the first three (3) fiscal quarters and (ii) each fiscal year of the Company.

(h)    "*Fully-Diluted Capitalization*" shall mean the number of outstanding Common Shares of the Company on a fully-diluted basis, including (i) conversion or exercise of all securities convertible into or exercisable for Common Shares, (ii) exercise of all outstanding options and warrants to purchase Common Shares, (iii) in the case of a conversion pursuant to Sections 2.1, 2.2 or 2.4 only, the shares reserved or authorized for issuance under the Company's existing stock option plan or any stock option plan created or increased in connection with such transaction, and (iv) the shares of Conversion Shares to be issued in connection with such

2

transaction (including upon the conversion any securities convertible for such Conversion Shares).

(i)     "*Initial Qualified Token Sale*" shall mean the first distribution, placement, sale or issuance by the Company, directly itself or indirectly through an affiliate or nominee, whether in a single or series of related transactions, greater than $5.0 million of any class or series of Tokens, excluding, for the avoidance of doubt, any such Tokens (i) issued to any network participant for the primary purpose of testing the Company's technology on a testnet network, (ii) allocated to an affiliate for platform integration or marketing purposes for no consideration and (iii) retained by the Company or allocated to officers, directors, employees or consultants of the Company for no consideration.

(j)     "*Participation Percentage*" shall equal 5.25%.

(k)     "*Preferred Shares*" shall mean the preferred shares in the capital of the Company.

(l)     "*Qualified Equity Financing*" shall mean the next sale (or series of related sales) by the Company of Preferred Shares following the Date of Issuance from which the Company receives gross proceeds of not less than $5.0 million (excluding the aggregate amount of securities converted into Preferred Shares in connection with such sale (or series of related sales)).

(m)     "*Management Rights Letter*" shall mean that certain management rights letter agreement, dated the date hereof, by and between the Company and ConsenSys.

(n)     "*Token*" shall mean collectively, all cryptographic tokens, coins, convertible virtual currencies, virtual mediums of exchange or similar instruments issued or issuable by the Company, whether or not currently authorized, as well as rights, options, or warrants to purchase such tokens, coins, convertible virtual currencies, virtual mediums of exchange or similar instruments of any type whatsoever that are, or may become, convertible or exchangeable into or exercisable for (directly or indirectly) such tokens, coins, convertible virtual currencies, virtual mediums of exchange or similar instruments.

2.     Conversion of the Convertible Equity Instrument.

2.1     Qualified Equity Financing.  Unless earlier converted pursuant to the terms hereof, upon the closing of a Qualified Equity Financing, this Convertible Equity Instrument will be automatically converted into that number of Conversion Shares equal to the greater of (i) the quotient obtained by dividing the Purchase Price by the lowest price per share at which the Company sells shares in the capital of the Company to investors in such Qualified Equity Financing and (ii) the Conversion Percentage multiplied by the Company's Fully-Diluted Capitalization.  At least five (5) days prior to the closing of a Qualified Equity Financing, the Company shall notify ConsenSys in writing of the terms under which the Preferred Shares of the Company will be sold in such financing.  The issuance of Conversion Shares pursuant to the conversion of this Convertible Equity Instrument shall be upon and subject to the same terms and conditions applicable to the Preferred Shares sold in a Qualified Equity Financing.

US-DOCS\103802799.1

2.2     Optional Conversion if Non-Qualified Equity Financing.  Unless earlier converted pursuant to the terms hereof, if the Company closes an equity financing transaction that does not qualify as a Qualified Equity Financing (a "Non-Qualified Equity Financing"), the Company shall provide ConsenSys with reasonable advance notice thereof and ConsenSys may elect in writing, within ten days thereafter, to receive shares pursuant to Section 2.1 as if the Non-Qualified Equity Financing were a Qualified Equity Financing.

2.3     Corporate Transaction.  Unless earlier repaid or converted pursuant to the terms hereof, in the event of a Corporate Transaction, at ConsenSys' election, this Convertible Equity Instrument shall be converted into that number of Conversion Shares equal to the Conversion Percentage multiplied by the Company's Fully-Diluted Capitalization.  At least ten (10) days prior to the closing of the Corporate Transaction, the Company shall notify ConsenSys in writing of the terms of the Corporate Transaction.

2.4     Initial Qualified Token Sale.  Unless earlier repaid or converted pursuant to the terms hereof, in the event of an Initial Qualified Token Sale, at ConsenSys' election, this Convertible Equity Instrument shall be converted into that number of Conversion Shares equal to the Conversion Percentage multiplied by the Company's Fully-Diluted Capitalization.  At least ten (10) days prior to the closing of the Initial Qualified Token Sale, the Company shall notify ConsenSys in writing of the terms of the Initial Qualified Token Sale.

2.5     No Fractional Shares.  Upon the conversion of this Convertible Equity Instrument into Conversion Shares, in lieu of any fractional shares to which ConsenSys would otherwise be entitled, the Company shall pay ConsenSys cash equal to such fraction multiplied by the price per share of the applicable security into which this Convertible Equity Instrument is converting.

2.6     Mechanics of Conversion.  As promptly as practicable after the conversion of this Convertible Equity Instrument, the Company at its expense will issue and deliver to ConsenSys, upon surrender of this Convertible Equity Instrument, a certificate or certificates for the number of Conversion Shares.  Conversion of this Convertible Equity Instrument may be made contingent upon the closing of a Qualified Equity Financing, Non-Qualified Equity Financing, Corporate Transaction or Initial Qualified Token Sale.

3.     Representations and Warranties of the Company.  In connection with the transactions provided for herein, the Company hereby represents and warrants to ConsenSys that:

3.1     Organization, Good Standing and Qualification.  The Company is a corporation duly organized, validly existing, and in good standing under the laws of the country of Canada and has all requisite corporate power and authority to carry on its business as now conducted.  The Company is duly qualified to transact business and is in good standing in each jurisdiction in which the failure to so qualify would have a material adverse effect on its business or properties.

3.2     Authorization.  Except for the authorization and issuance of the Conversion Shares issuable in connection with a Qualified Equity Financing, Non-Qualified

Equity Financing, Corporate Transaction or Initial Qualified Token Sale, all corporate action has been taken on the part of the Company, its officers, directors and shareholders necessary for the authorization, execution and delivery of this Convertible Equity Instrument and the Management Rights Letter (collectively, the "***Transaction Documents***").   The Company has taken all corporate action required to make all of the obligations of the Company reflected in the provisions of the Transaction Documents the valid and enforceable obligations they purport to be, and the Transaction Documents, when executed and delivered by the Company, shall constitute the valid and legally binding obligation of the Company, enforceable against the Company in accordance with its terms.

> 3.3     Offering.   Subject in part to the truth and accuracy of ConsenSys' representations set forth herein, the offer, sale and issuance of this Convertible Equity Instrument are exempt from the registration requirements of any applicable securities laws, and neither the Company nor any authorized agent acting on its behalf will take any action hereafter that would cause the loss of such exemption.

> 3.4     Compliance with Other Instruments.   The execution, delivery and performance of Transaction Documents, and the consummation of the transactions contemplated thereby, will not constitute or result in a default, violation, conflict or breach in any material respect of any provision of the Company's current Certificate of Incorporation or bylaws, or in any material respect of any instrument, judgment, order, writ, decree, privacy policy or contract to which it is a party or by which it is bound, or, to its knowledge, of any provision of any federal or state statute, rule or regulation applicable to the Company.

> 3.5     Valid Issuance of Shares.   The Conversion Shares, when issued, sold and delivered upon conversion of this Convertible Equity Instrument, will be duly authorized and validly issued, fully paid and nonassessable, will be free of restrictions on transfer other than restrictions on transfer set forth herein and pursuant to applicable securities laws and, based in part upon the representations and warranties of ConsenSys herein, will be issued in compliance with all applicable securities laws.

> 3.6     Intellectual Property.   To its knowledge, the Company owns or possesses or believes it can acquire on commercially reasonable terms sufficient legal rights to all patents, patent applications, trademarks, trademark applications, service marks, tradenames, copyrights, trade secrets, licenses, domain names, mask works, information and proprietary rights and processes as are necessary to the conduct of its business as now conducted and as presently proposed to be conducted without any known conflict with, or infringement of, the rights of others.   The Company has not received any communications alleging that the Company has violated or, by conducting its business, would violate any of the patents, trademarks, service marks, tradenames, copyrights, trade secrets, mask works or other proprietary rights or processes of any other person.

> 3.7     Litigation.   To the Company's knowledge, there is no private or governmental action, suit, proceeding, claim, arbitration or investigation pending before any agency, court or tribunal, foreign or domestic, or threatened against the Company or any of its properties or any of its officers or managers (in their capacities as such).   There is no judgment, decree or order against the Company, or, to the knowledge of the Company, any of its directors

US-DOCS\103802799.1

or managers (in their capacities as such), that could prevent, enjoin, or materially alter or delay any of the transactions contemplated by the Transaction Documents, or that could reasonably be expected to have a material adverse effect on the Company.

3.8     Tax Status.    The Company has not since the date of its formation made an election to be treated as other than as an association taxable as a corporation for U.S. federal income tax purposes. Without the consent of ConsenSys, Company will not make any election to take any other action that would cause Company not to be treated as an association taxable as a corporation for U.S. federal income tax purposes.

4.     Representations and Warranties of ConsenSys.    In connection with the transactions provided for herein, ConsenSys hereby represents and warrants to the Company that:

4.1     Authorization.    This Convertible Equity Instrument constitutes ConsenSys' valid and legally binding obligation, enforceable in accordance with its terms, except as may be limited by (i) applicable bankruptcy, insolvency, reorganization, or similar laws relating to or affecting the enforcement of creditors' rights and (ii) laws relating to the availability of specific performance, injunctive relief or other equitable remedies.

4.2     Purchase Entirely for Own Account.    ConsenSys acknowledges that this Convertible Equity Instrument is issued to ConsenSys in reliance upon ConsenSys' representation to the Company that the Convertible Equity Instrument will be acquired for investment for ConsenSys' own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof, and that ConsenSys has no present intention of selling, granting any participation in, or otherwise distributing the same.

4.3     Investment Experience.    ConsenSys is an investor in securities of companies in the development stage and acknowledges that it is able to fend for itself, can bear the economic risk of its investment, and has such knowledge and experience in financial or business matters that it is capable of evaluating the merits and risks of the investment in this Convertible Equity Instrument. ConsenSys also represents it has not been organized solely for the purpose of acquiring this Convertible Equity Instrument.

4.4     Accredited Investor.    ConsenSys is an "accredited investor" within the meaning of (i) National Instrument 45-106 – Prospectus Exemptions ("NI *45-106*"), and (ii) Rule 501 of Regulation D, as presently in effect, as promulgated by the Securities and Exchange Commission (the "*SEC*") under the Securities Act of 1933, as amended (the "*Act*"). Investor shall provide the Company with any additional information reasonably necessary for the Company to validate which category of "accredited investor" under NI 45-106 applies to the Investor, including executing an accredited investor qualification form.

4.5     Restricted Security.    ConsenSys understands that this Convertible Equity Instrument is characterized as a "restricted security" under applicable securities laws inasmuch as it is being acquired from the Company in a transaction not involving a public offering and that under such laws and applicable regulations such securities may be resold without registration under applicable securities laws, only in certain limited circumstances.

6

5.    <u>Miscellaneous</u>.

5.1    <u>ConsenSys Rights</u>.   The Company shall provide ConsenSys with the following additional rights:

(a)    <u>Information Rights</u>.   To the extent that the Company prepares Financial Statements, the Company shall deliver to ConsenSys such Financial Statements upon request, as soon as practicable, but in any event within thirty (30) days after the end of each of the first three (3) quarters of each fiscal year of the Company and within ninety (90) days after the end of each fiscal year of the Company.   Such Financial Statements shall be in reasonable detail and prepared on a consistent basis.   Additionally, regardless of whether the Company prepares Financial Statements, the Company shall deliver to ConsenSys such information relating to the financial condition, business or corporate affairs of the Company as ConsenSys may from time to time reasonably request.   Notwithstanding anything to the contrary in this Section 5.1(a), the Company shall not be obligated under this Section 5.1(a) to provide information that (x) it deems in good faith to be a trade secret or highly confidential information or (y) the disclosure of which would adversely affect the attorney-client privilege between the Company and its counsel; and ConsenSys agrees to maintain the confidentiality of all of the information provided to it under this Section 5.1(a) and agrees not to use such information other than for a purpose reasonably related to ConsenSys' investment in the Company.

(b)    <u>Reserved</u>.

(c)    <u>Participation Rights</u>.   Each time the Company proposes to offer any Equity Securities at any time through and including the closing of a Qualified Equity Financing, the Company shall provide ConsenSys with at least ten (10) business days prior written notice of such offering, including the price and terms thereof.   ConsenSys shall have a right of first offer to participate in such offering(s), on the same terms and for the same price as all other investors in such offering(s), by purchasing an aggregate number of Equity Securities (whether in one offering or across multiple offerings) equal to the product of the total number of Equity Securities to be sold in such offerings multiplied by the Participation Percentage. ConsenSys' right of first offer set forth in this Section 5.2(c) shall be subject to compliance with applicable securities laws.   The Company and ConsenSys further agree that the transaction documents related to any Qualified Equity Financing, Non-Qualified Equity Financing or Initial Qualified Token Sale in which this Convertible Equity Instrument is converted shall provide ConsenSys with a substantially similar right to participate in offerings of Equity Securities following such conversion.

(d)    <u>"Major Investor" Rights</u>.   The Company shall ensure that ConsenSys shall be deemed to be a "Major Investor" (or such similar term) for all purposes, including, without limitation, rights of first offer and information rights, in relevant financing documents related to all subsequent sales of Equity Securities, to the extent such concept exists.

5.2    <u>Payment</u>.   All payments, if any, shall be made in lawful money of the United States of America.

7

5.3     Attorneys' Fees; Indemnity.  The Company agrees that any delay on the part of ConsenSys in exercising any rights hereunder will not operate as a waiver of such rights. ConsenSys shall not by any act, delay, omission or otherwise be deemed to have waived any of its rights or remedies, and no waiver of any kind shall be valid unless in writing and signed by the party or parties waiving such rights or remedies.  If any action at law or in equity is necessary to enforce or interpret the terms of this Convertible Equity Instrument, the prevailing party shall be entitled to reasonable attorneys' fees, costs and necessary disbursements in addition to any other relief to which such party may be entitled.  The Company shall indemnify and hold ConsenSys harmless from any loss, cost, liability and legal or other expense, including attorneys' fees of ConsenSys' counsel, which ConsenSys may directly or indirectly suffer or incur by reason of the failure of the Company to perform any of its obligations under this Convertible Equity Instrument or any agreement executed in connection herewith; provided, however, that the indemnity agreement contained in this Section 5.3 shall not apply to liabilities which ConsenSys may directly or indirectly suffer or incur by reason of its own gross negligence or willful misconduct.

5.4     Successors and Assigns.  The terms and conditions of this Convertible Equity Instrument shall inure to the benefit of and be binding upon the respective successors and assigns of the parties hereto; provided, however, that the Company may not assign its obligations under this Convertible Equity Instrument without the prior written consent of ConsenSys.

5.5     Governing Law.  This Convertible Equity Instrument shall be governed by and construed under the laws of the State of California as applied to other instruments made by California residents to be performed entirely within the State of California, regardless of the laws that might otherwise govern under applicable principles of conflicts of law.

5.6     Notices.  All notices and other communications given or made pursuant to this Convertible Equity Instrument shall be in writing and shall be deemed effectively given upon the earlier of actual receipt or:  (a) personal delivery to the party to be notified, (b) when sent, if sent by electronic mail or facsimile during normal business hours of the recipient, and if not sent during normal business hours, then on the recipient's next business day, (c) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one (1) business day after deposit with a nationally recognized overnight courier, freight prepaid, specifying next business day delivery, with written verification of receipt.

5.7     Financing Agreements.  ConsenSys understands and agrees that the conversion of the Convertible Equity Instrument into Conversion Shares may require ConsenSys' execution of certain agreements relating to the purchase and sale of such securities as well as registration, co-sale, rights of first refusal, rights of first offer and voting rights, if any, relating to such securities.  ConsenSys agrees to execute all such agreements in connection with the conversion so long as the issuance of Conversion Shares issued pursuant to the conversion of this Convertible Equity Instrument are subject to the same terms and conditions applicable to the Preferred Shares sold in a Qualified Equity Financing or  to such other shares in the capital of the Company sold in a Non-Qualified Equity Financing, as applicable.

5.8     Severability.  If one or more provisions of this Convertible Equity Instrument are held to be unenforceable under applicable law, such provision shall be excluded

8

from this Convertible Equity Instrument and the balance of the Convertible Equity Instrument shall be interpreted as if such provision were so excluded and shall be enforceable in accordance with its terms.

5.9     Acknowledgement.  For the avoidance of doubt, it is acknowledged that ConsenSys shall be entitled to the benefit of all adjustments in the number of Common Shares issuable upon conversion of the Preferred Shares or as a result of any splits, recapitalizations, combinations or other similar transaction affecting the Common Shares or Preferred Shares underlying the Conversion Shares that occur prior to the conversion of the Convertible Equity Instrument.

5.10     Further Assurance.  From time to time, the Company shall execute and deliver to ConsenSys such additional documents and shall provide such additional information to ConsenSys as it may reasonably require to carry out the terms of this Convertible Equity Instrument and to be informed of the financial and business conditions and prospects of the Company.

5.11     Transfer of a Convertible Equity Instrument.  Subject to compliance with applicable securities laws, this Convertible Equity Instrument and all rights hereunder shall not be transferable in whole or in part by ConsenSys without the prior written notice to the Company; provided, that, ConsenSys may transfer this Convertible Equity Instrument to its affiliates.

5.12     Entire Agreement; Amendments and Waivers.  The Transaction Documents constitute the full and entire understanding and agreement between the Company and ConsenSys with regard to the subjects hereof.  Any term of this Convertible Equity Instrument may be amended and the observance of any term of this Convertible Equity Instrument may be waived (either generally or in a particular instance and either retroactively or prospectively), with the written consent of the Company and ConsenSys.

5.13     Equity Instrument.  Notwithstanding anything herein or in any other agreement to the contrary, this Convertible Equity Instrument shall be treated as equity for tax purposes (shall in no event be treated as "preferred stock" for purposes of Section 305 of the Internal Revenue Code) and the tax treatment and fair market value thereof shall be determined by ConsenSys, and such determination shall be binding on the parties for all tax reporting purposes.

[*Signature Page Follows*]

9

US-DOCS\103802799.1

6.      Approval.  The Company hereby represents that its Board of Directors, in the exercise of its fiduciary duty, has approved the Company's execution of this Convertible Equity Instrument based upon a reasonable belief that the Purchase Price provided hereunder is appropriate for the Company after reasonable inquiry concerning the Company's financing objectives and financial situation.  In addition, the Company hereby represents that it intends to use the Purchase Price primarily for the operations of its business, and not for any personal, family or household purpose.

**BLOCKCRUSHR INC.**

By: _Michael Scott Burke_ (DocuSigned by: 39505538DB4040A...)

Name: Michael Scott Burke

Title: Chief Executive Officer

Address: 2982 Oxford St., Halifax, Nova Scotia, Canada B3L 2W4

ACKNOWLEDGED AND AGREED:

**CONSENSYS FUND I, L.P.**

By: _____

Name: _____

Title: _____

Address: _____

_____

Signature Page