# EXHIBIT D

# BLOCKCRUSHR INC.

_____ \_\_, 20\_\_

ConsenSys Fund I, L.P.
49 Bogart #22
Brooklyn, NY 11206
Attn: ConsenSys Legal

Re:     Management Rights Letter

Ladies and Gentlemen:

This management rights letter (the "*Management Rights Letter*") will confirm our agreement that pursuant to and effective as of your purchase of a Convertible Equity Instrument (the "*Convertible Equity Instrument*"), issued as of the date hereof, of BlockCrushr Inc., a corporation incorporated under the laws of Canada (the "*Company*"), ConsenSys Fund I, L.P. ("*ConsenSys*") shall be entitled to the following contractual rights, in addition to any rights to non-public financial information and other rights specifically provided to ConsenSys in the Convertible Equity Instrument.  Capitalized terms used in this Management Rights Letter and not defined herein have the meanings specified in the Convertible Equity Instrument.

1. Consultation Rights.  ConsenSys shall be entitled to consult with and advise management of the Company on significant business issues, including management's proposed annual operating plans, and management will meet with ConsenSys regularly during each year at the Company's facilities at mutually agreeable times for such consultation and advice and to review progress in achieving said plans.

2. Inspection Rights.  ConsenSys may examine the books and records of the Company and inspect its facilities and may request information at reasonable times and intervals concerning the general status of the Company's financial condition and operations, provided that access to highly confidential proprietary information and facilities need not be provided.

3. ConsenSys Board Rights.

    (a)     From and following the date hereof, ConsenSys shall be entitled to designate a representative to serve on the Board of Directors of the Company (**"Board"**), and the Company and ConsenSys hereby agree that the transaction documents related to any Qualified Equity Financing, Non-Qualified Equity Financing or Initial Qualified Token Sale in which the Convertible Equity Instrument is converted shall provide that (i) each holder of Conversion Shares shall be required to become party to such documents, (ii) the holders of the Conversion Shares (including ConsenSys) issued in connection with such transaction, as applicable, shall be entitled to elect (voting as a separate class)

at least one member to the Board (a "**Preferred Director**"), (ii) ConsenSys shall be entitled to designate one Preferred Director (the "**ConsenSys Director**") and (iii) each holder of Conversion Shares shall be required to vote, or cause to be voted, all shares in the capital of the Company owned by such shareholder, or over which such shareholder has voting control, from time to time and at all times, in whatever manner as shall be necessary to ensure that at each annual or special meeting of shareholders at which an election of directors is held or pursuant to any written consent of the shareholders, the ConsenSys Director shall be elected to the Board.

(b) Each of Michael Scott Burke and Andrew Lloyd Redden (each, a "**Founder**") hereby agrees that such Founder shall vote, or cause to be voted, all shares in the capital of the Company owned by such Founder, or over which such Founder has voting control, from time to time and at all times, in whatever manner as shall be necessary to give effect to the terms hereof and to ensure that at each annual or special meeting of shareholders at which an election of directors is held or pursuant to any written consent of the shareholders, the ConsenSys Director shall be elected to the Board.

(c) Promptly following the date hereof (or promptly following the appointment of a ConsenSys Director if such director is not immediately appointed), the Company shall obtain, from financially sound and reputable insurers, Directors and Officers liability insurance in an amount and on terms and conditions reasonably satisfactory to the Board (including the affirmative vote of the ConsenSys Director), and will use commercially reasonable efforts to cause such insurance policies to be maintained until such time as the Board (including the affirmative vote of the ConsenSys Director) determines that such insurance should be discontinued.

(d) The rights of ConsenSys and the obligations of the Company and Founder under clauses (a) and (b) of Section 3 shall terminate and be of no further force or effect upon the conversion of the Convertible Equity Instrument in connection with a Qualified Equity Financing, Non-Qualified Equity Financing or Initial Qualified Token Sale; provided that the provisions of this Section 3 will continue after the closing of any such Qualified Equity Financing, Non-Qualified Equity Financing or Initial Qualified Token Sale to the extent necessary to enforce the provisions of this Section 3 with respect to such transaction.

4. Observer Rights. At any time when ConsenSys is not represented on the Board, the Company shall invite a representative of ConsenSys to attend in a non-voting observer capacity all meetings (including committees) of its Board, including all executive sessions, and give the representative of ConsenSys copies of all material that the Company provides to its directors (including minutes, consents and third party valuation (409A) reports), except that the representative may be excluded from access to any material or meeting or portion thereof if the Company believes, upon advice of counsel, that such exclusion is reasonably necessary to preserve the attorney-client privilege or to protect highly confidential proprietary information. Upon reasonable notice and at a scheduled meeting of the Board or such other time, if any, as the Board may determine in its sole discretion, such representative may address the Board with respect to the ConsenSys' concerns regarding significant business issues facing the Company.

5. <u>Intellectual Property and Advisors</u>.  For so long as ConsenSys continues to hold any Convertible Equity Instruments or no fewer than 5% of the Company's Fully-Diluted Capitalization, the Company shall not, either directly or indirectly by amendment, merger, consolidation or otherwise, do any of the following without the written consent or affirmative vote of ConsenSys, and any such act or transaction entered into without such consent or vote shall be null and void *ab initio*, and of no force or effect: (i) transfer, license or otherwise authorize any contractual obligation of the Company that in any way encumbers any material technology or intellectual property of the Company outside the ordinary course of business, other than any transaction approved by the Board (including the affirmative vote of the ConsenSys Director, if any is then serving); or (ii) appoint any advisors to any advisory board of the Company, other than any transaction approved by the Board (including the affirmative vote of the ConsenSys Director, if any is then serving).

6. <u>Token Approval Rights</u>.  The Company hereby agrees that (1) the design and technical specifications of any Tokens to be sold, issued, created, authorized or distributed, whether directly by the Company or indirectly through an affiliate or nominee, including through a pre-sale, initial coin offering, token distribution event or crowdfunding, or through the issuance of any instrument convertible into or exchangeable for Tokens, and (2) the terms, conditions and offering procedures of any such sale, shall be approved by the Board (including the affirmative vote of the ConsenSys Director) prior to any such sale, issuance, creation, authorization or distribution.

7. <u>Token Sale Participation Rights</u>.  Subject to the terms and conditions herein and applicable securities laws of any Relevant Jurisdiction (as defined below), if the Company proposes to distribute, place, sell or issue, directly itself or indirectly through an affiliate or nominee, whether in a single or series of related transactions, any Tokens (a "***Token Sale***"), the Company shall offer certain of the Tokens to ConsenSys in accordance with this Section 7.  ConsenSys shall be entitled to apportion the right to participate in the Token Sale hereby granted to it, in such proportions as it deems appropriate, among (i) itself and (ii) its affiliates.

   (a)  At least thirty (30) days and no more than sixty (60) days prior to the initiation of a Token Sale, the Company shall give notice (the "***Token Offer Notice***") to ConsenSys, stating (i) its bona fide intention to offer such Tokens, (ii) the number of such Tokens to be offered, (iii) the proposed timeline of the Token Sale and (iv) the proposed prices and terms, if any, upon which it proposes to offer such Tokens.

   (b)  By notification to the Company within ninety (90) days after the Token Offer Notice is given, ConsenSys may elect to purchase or otherwise acquire, at the price and on the terms specified in the Token Offer Notice, up to that portion of such Tokens of a class or series which equals the Token Participation Percentage (as defined below) of the total number of Tokens of such class or series proposed to be issued by the Company in such Token Sale as set forth in the Token Offer Notice.

   (c)  If any Tokens in a Token Sale are offered and sold at different prices, the per-Token price to be paid by ConsenSys for purposes hereof will be the

US-DOCS\102121532.8
US-DOCS\103112316.2

lowest price offered to any person or persons purchasing or otherwise acquiring Tokens in such Token Sale and the Company agrees that it shall not offer, distribute, place, sell or issue any portion of such Tokens to any person or persons at a price less than, and upon terms more favorable to the offeree than, those specified in the Token Offer Notice.

(d) Subject to clauses (e) and (f) of this Section 7, any Tokens purchased or otherwise acquired by ConsenSys pursuant to this Section 7 shall be delivered by the Company to ConsenSys prior to expiration of the Token Lockup Period (as defined below).

(e) In the event that either the Company or ConsenSys determines in good faith, based on the advice of counsel, that any Token of a class or series to be issued upon the exercise by ConsenSys of its rights set forth in this Section 7, could reasonably be expected to be deemed to be a security under the applicable securities laws of any Relevant Jurisdiction, the parties agree that (i) ConsenSys option to exercise its rights set forth in this Section 7 shall continue until the first anniversary of the date on which the Token Offer Notice for such Token Sale was delivered (the "***Extension Date***"), (ii) the Company's obligation to deliver the Tokens pursuant to clause (d) of this Section 7 shall be extended to the Extension Date and (iii) the parties shall otherwise negotiate and cooperate in good faith to preserve the economic and other rights of ConsenSys as set forth herein and facilitate the performance of this Management Rights Letter (including, without limitation, by extending or otherwise restructuring the rights and obligations set forth in this Section 7 beyond the Extension Date).

(f) In lieu of the issuance and sale of Tokens upon the exercise by ConsenSys of its rights set forth in this Section 7, if there occurs any development of, change in, or amendment to, or introduction of, an official written position regarding the application, administration or interpretation of the laws, treaties, regulations or rulings of any Relevant Jurisdiction (including a holding, judgment or order by a court of competent jurisdiction) which becomes effective on or after the date hereof, and following which the Company or ConsenSys determines in good faith that the issuance and sale of any Tokens upon the exercise by ConsenSys of its rights set forth in this Section 7 would not be legally permissible or have a material adverse effect on the economic or other rights of ConsenSys hereunder, the Company and ConsenSys agree to cooperate with each other in good faith to preserve such economic and other rights of ConsenSys as set forth herein and facilitate the performance of this Management Rights Letter (including, without limitation, by extending or otherwise restructuring the rights and obligations set forth in this Section 7 beyond the Extension Date).

(g) For purposes hereof:

(i) "***Relevant Jurisdiction***" shall mean (i) any jurisdiction in which the Company or the purchaser(s) is then incorporated or organized or engaged in business or any political subdivision thereof or therein or (2) any jurisdiction from or through which payment on the Convertible Equity Instrument is made by or on behalf of the issuer or upon the sale and purchase of the Tokens is made by or on behalf of the purchaser(s), or any political subdivision or governmental authority thereof or therein.

    (ii) "***Token***" shall mean collectively, all cryptographic tokens, coins, convertible virtual currencies, virtual mediums of exchange or similar instruments issued or issuable by the Company, whether or not currently authorized, as well as rights, options, or warrants to purchase such tokens, coins, convertible virtual currencies, virtual mediums of exchange or similar instruments of any type whatsoever that are, or may become, convertible or exchangeable into or exercisable for (directly or indirectly) such tokens, coins, convertible virtual currencies, virtual mediums of exchange or similar instruments.

    (iii) "***Token Participation Percentage***" equals the product of (a) 2.5% and (b) the quotient obtained by dividing (x) the aggregate Purchase Price of all Convertible Equity Instruments purchased by ConsenSys prior to the time of such Token Sale by (y) the Maximum Purchase Price.

8. <u>Token Lockup Agreement</u>. ConsenSys hereby agrees that it will not, without the prior written consent of the Company, for a period of one-hundred eighty (180) days commencing upon the later of (a) the date of the first closing of the Initial Qualified Token Sale and (b) the date ConsenSys first purchases Tokens upon the exercise of its rights set forth in <u>Section 7</u> (the "***Token Lockup Period***") (i) lend; offer; pledge; sell; contract to sell; sell any option or contract to purchase; purchase any option or contract to sell; grant any option, right, or warrant to purchase; or otherwise transfer or dispose of, directly or indirectly, any Tokens of such class or series or (ii) enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of such Tokens, whether any such transaction described in clause (i) or (ii) above is to be settled by delivery of Tokens, other virtual currencies or virtual mediums of exchange, in cash, or otherwise. The foregoing provisions of this <u>Section 8</u> shall apply only to the Tokens purchased or otherwise acquired by ConsenSys upon the exercise of its right of first offer pursuant to <u>Section 7</u> hereof and shall not apply to Tokens purchased or otherwise acquired on any secondary market. Such restrictions shall also not apply to (i) the transfer of any Tokens to any affiliate of ConsenSys, provided that ConsenSys notifies the Company of any such transfer and the applicable transferee agrees to be bound in writing by the restrictions set forth herein, and provided further that any such transfer shall not involve a disposition for value and (ii) any transfer or disposition of any Tokens to satisfy any actual or potential tax liabilities of ConsenSys (together with its affiliates) resulting from any of the transactions contemplated hereby. In addition, such restrictions shall be applicable to ConsenSys only if all officers and directors of the Company are subject to similar restrictions at least as restrictive as the restrictions set forth herein. Any discretionary waiver or termination of the restrictions of any or all of such agreements by the Company shall apply pro rata to ConsenSys based on the number of Tokens held.

The parties to this Management Rights Letter agree and acknowledge that the right to purchase Tokens set forth in <u>Section 7</u> is supported by separate consideration and is irrevocable unless mutually agreed by the parties.

ConsenSys agrees, and will cause any representative acting as an observer under <u>Section 4</u> to agree, that it will keep confidential and will not disclose, divulge, or use for any purpose (other

US-DOCS\102121532.8
US-DOCS\103112316.2

than to monitor its investment in the Company) any confidential information obtained from the Company pursuant to the terms of this Agreement (including notice of the Company's intention to file a registration statement), unless such confidential information (a) is known or becomes known to the public in general (other than as a result of a breach of this paragraph by ConsenSys), (b) is or has been independently developed or conceived by ConsenSys without use of the Company's confidential information, or (c) is or has been made known or disclosed to ConsenSys by a third party without a breach of any obligation of confidentiality such third party may have to the Company; provided, however, that ConsenSys may disclose confidential information (i) to its attorneys, accountants, consultants, and other professionals to the extent necessary to obtain their services in connection with making, monitoring or managing its investment in the Company; (ii) to any prospective purchaser of any securities of the Company from ConsenSys, if such prospective purchaser agrees to be subject to similar confidentially obligations; (iii) to any existing or prospective affiliate, partner, member, shareholder, or wholly owned subsidiary of ConsenSys in the ordinary course of business, provided that ConsenSys informs such person that such information is confidential and directs such person to maintain the confidentiality of such information; or (iv) as may otherwise be required by law, regulation, rule, court order or subpoena, provided that ConsenSys promptly notifies the Company of such disclosure and takes reasonable steps to minimize the extent of any such required disclosure.

The rights described herein shall terminate and be of no further force or effect upon (a) the consummation of the sale of the Company's securities pursuant to a registration statement filed by the Company under the Securities Act of 1933, as amended, or a prospectus filed under applicable Canadian securities laws, in connection with the firm commitment underwritten offering of its securities to the general public or (b) the consummation of a Corporate Transaction.

[*Signature Page Follows*]

Very truly yours,

**BLOCKCRUSHR INC.**

By: _Michael Scott Burke_
     DocuSigned by: 39505538DB4646A...

Name: Michael Scott Burke

Title: Chief Executive Officer

Address: 2982 Oxford St.
Halifax, NS Canada B3L 2W4

ACKNOWLEDGED AND AGREED:

**CONSENSYS FUND I, L.P.**

By: _____

Name: _____

Title: _____

Address: _____
         _____

Management Rights Letter Signature Page

US-DOCS\103112316.2

ACKNOWLEDGED AND AGREED:

**FOUNDER**

By: *Michael Scott Burke*
    DocuSigned by: 39505538DB4646A...

Name: Michael Scott Burke

Address: 2982 Oxford St.
Halifax, NS Canada B3L 2W4


**FOUNDER**

By: *Andrew Redden*
    DocuSigned by: BB29CD8BF2094D7...

Name: Andrew Lloyd Redden

Address: 303-40 Chelton Woods Lane
Halifax, NS Canada B3M 3V2

Management Rights Letter Signature Page

US-DOCS\103112316.2